Filed 9/30/25  In re E.R. CA2/3

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re E.R., a Person Coming Under the Juvenile Court Law. | B344323<br><br>(Los Angeles County Super. Ct. No. 22CCJP03004A) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>        Plaintiff and Respondent,<br><br>        v.<br><br>J.M.,<br><br>        Defendant and Appellant. | |

        APPEAL from an order of the Superior Court of Los Angeles County, Safaan K. Ahmed, Judge.  Affirmed.

        John P. McCurley, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, and Sally Son, Deputy County Counsel, for Plaintiff and Respondent.

———————————————

Mother appeals from a juvenile court order terminating her parental rights.  Mother contends the court erred in failing to apply the parental benefit exception to adoption.  We find no error and affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

The Los Angeles County Department of Children and Family Services (DCFS) detained E.R. from mother shortly after E.R. was born with a positive toxicology for cocaine.  In September 2022, the juvenile court sustained a petition and asserted dependency jurisdiction over E.R. based on mother's ongoing and unresolved substance abuse.  The court removed E.R. from the parents.[1]  DCFS placed E.R. with the maternal grandparents.

Over approximately the next year and a half, mother participated in reunification services and visited E.R. regularly.  For a brief period, E.R. was placed with mother under DCFS supervision.  During that time, E.R. and mother continued living with the maternal grandparents.  However, mother continued to struggle with substance abuse.

On one occasion in late December 2023, mother arrived at the maternal grandparents' home at 2:00 a.m.  Mother was drunk.  She attempted to take E.R. to a friend's house.  When the maternal grandparents refused to allow mother to take E.R., mother called the police.  Law enforcement officers managed to

_____

[1]    Father is not a party to this appeal.

calm mother down and she did not take E.R. from the maternal grandparents' home. The maternal grandmother later told a social worker that she wanted to kick mother out of the house "due to the mother's consistent irresponsible behavior, including frequent late-night returns while intoxicated." However, the maternal grandmother was "scared because she does not want the mother to take [E.R.] with her. [Mother] goes to work and comes home and does not dedicate adequate time to her child. The maternal grandmother shared that she and her husband take care of [E.R.] like their own, and they want to continue to protect her and provide her with a safe and stable home."

In April 2024, the juvenile court again detained E.R. from mother after she was repeatedly under the influence of alcohol while E.R. was in her care. In May 2024, the juvenile court removed E.R. once more from both parents and set a permanency planning hearing.[2]

A September 2024 permanency planning report noted that the maternal grandparents had been a consistent presence in E.R.'s short life. She had a "healthy bond" with them. They wanted to adopt her. E.R. called the grandparents " 'mama' " and " 'papa,' " and had been observed following them around the home. E.R. was affectionate with the grandparents, hugging them and asking to be held.

The report also observed that mother had maintained consistent and frequent visitation with E.R. for the pendency of the case. Although the maternal grandparents had been more

---

[2]     The juvenile court had briefly released E.R. to father after detaining her from mother. However, E.R. continued to live with the maternal grandparents and father failed to make any arrangements with them for E.R.'s care.

3

involved in obtaining developmental services for E.R., mother was present during some of E.R.'s appointments and had a "general understanding" of E.R.'s participation in services. When describing the relationship between mother and E.R., the report opined: "Generally, [E.R.] is content during her Family Time with the mother. [E.R.] does not show fear, caution, or ambivalence towards her mother. The caregiver believes that [E.R.] and the mother are bonded. Notably, [E.R.] appears emotionally and mentally stable when the mother ends Family Time."

According to the report, the maternal grandmother believed "mother does an acceptable job in meeting [E.R.'s] needs. She does the bare minimum of feeding [E.R.] and when appropriate, bathing [E.R.] They play and engage; however, the caregiver would like the mother to be more affectionate and attentive. For example, there are moments when [E.R.] is seeking comfort and it would be appropriate for the mother to hold [E.R.] or speak affectionately; however, she does not. The caregiver did make it clear that she believes [E.R.] and the mother are bonded. She just wishes that at times, the mother were more attentive. For example, the mother spends time on her phone during Family Time." Although the maternal grandmother believed E.R. viewed mother as her parent, E.R. went to the maternal grandmother for her needs and referred to the maternal grandmother "as a mother." Nonetheless, the report opined that mother's relationship with E.R. did "not appear to have negative features." Overall, the report concluded that "[g]iven the mother's consistent presence in [E.R.]'s life, there is a significant positive emotional attachment."

In late September 2024, the maternal grandmother reported that after mother finished a recent visit with E.R. at the

maternal grandparents' home, the maternal grandmother found mother in the dining room drinking a beer. Maternal grandmother asked mother to leave. A November 2024 status review report indicated that although the maternal grandparents reported that mother was consistent with visits, "she constantly needs to be reminded to get off her phone and spend[ ] more quality time with the child, [E.R.] In addition, during the week, she calls maternal grandparents to ask if she can drop off food for [E.R.], and shows up home hours later and smelling like alcohol."

DCFS's February 2025 permanency planning report noted that mother continued to consistently visit E.R. The maternal grandmother now reported that "on occasion," E.R. cried when mother left a visit, but she quickly stopped when told mother would return for another visit. Mother had been more affectionate with E.R. During visits, she fed and bathed E.R., washed her clothes, played with her, and practiced words with her. E.R. "also finds comfort falling asleep next to the mother." Yet, E.R. continued to seek out the maternal grandmother for her needs. Sometimes, when mother attempted to help E.R., E.R. would insist that the maternal grandmother help her instead. E.R. referred to the maternal grandmother as " 'ma.' "

At the February 2025 permanency planning hearing, mother argued the juvenile court should apply the parental benefit exception to adoption and reject DCFS's recommendation that the court terminate mother's parental rights. DCFS's counsel acknowledged that mother had maintained regular and consistent visitation and that there was a beneficial relationship between mother and E.R. Nonetheless, DCFS's position was that the permanence and stability E.R. would obtain through adoption outweighed any detriment to her from severing the relationship

with mother.  Mother's counsel contended the evidence showed there was a significant positive emotional attachment between E.R. and mother and it would be detrimental to sever the relationship.

Although DCFS suggested mother's visits would continue even if her parental rights were terminated, the juvenile court began its ruling by stating that it was not considering any future visitation in its consideration of the parental benefit exception. The court found mother had maintained regular visitation and there was a "significant positive emotional attachment" between E.R. and mother.  However, the court described the stability and permanence that adoption would give E.R. and concluded the exception did not apply.  The court therefore terminated parental rights.  Mother timely appealed.

### DISCUSSION

### I.     The Parental Benefit Exception to Adoption

At the permanency planning hearing pursuant to Welfare and Institutions Code section 366.26,[3] the juvenile court must select a permanent plan for a dependent child to provide the child a "stable, permanent" home.  (*Id*., subd. (b); *In re S.G.* (2024) 100 Cal.App.5th 1298, 1313.)  If the court finds by clear and convincing evidence that the child is likely to be adopted, the court must terminate parental rights, unless the parent establishes that termination would be detrimental to the child for one of the reasons outlined in section 366.26, subdivision (c).  (*In re Caden C.* (2021) 11 Cal.5th 614, 630 (*Caden C.*).)  The " 'statutory exceptions merely permit the court, in exceptional

---

[3]     All further statutory references are to the Welfare and Institutions Code.

6

circumstances [citation], to choose an option other than the norm, which remains adoption.' [Citation.]" (*Id.* at p. 631.)

Here, mother contends the juvenile court erred by declining to apply the parental benefit exception to adoption. Under section 366.26, subdivision (c)(1)(B)(i), the juvenile court may choose a permanent plan other than adoption when it finds termination of parental rights would be detrimental to the child because the parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship.

The California Supreme Court has explained that a "parent asserting the parental benefit exception must show, by a preponderance of the evidence, three things. The parent must show regular visitation and contact with the child, taking into account the extent of visitation permitted. Moreover, the parent must show that the child has a substantial, positive, emotional attachment to the parent—the kind of attachment implying that the child would benefit from continuing the relationship. And the parent must show that terminating that attachment would be detrimental to the child even when balanced against the countervailing benefit of a new, adoptive home." (*Caden C.*, *supra*, 11 Cal.5th at p. 636.)

The first two requirements are not at issue in this case. The juvenile court found mother had regular visitation and contact with E.R., and that E.R. had a substantial, positive emotional attachment to mother. We review the third requirement for an abuse of discretion. We will find an abuse of discretion "only when ' " 'the . . . court has exceeded the limits of legal discretion by making an arbitrary, capricious, or patently

7

absurd determination.' " ' [Citation.]" (*Caden C., supra*, 11 Cal.5th at p. 641.)

## II. The Juvenile Court Did Not Err in Concluding the Parental Benefit Exception Did Not Apply

When evaluating the third element of the parental benefit exception, courts must determine "whether the harm of severing the relationship outweighs 'the security and the sense of belonging a new family would confer.' [Citation.] 'If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that,' even considering the benefits of a new adoptive home, termination would 'harm[ ]' the child, the court should not terminate parental rights. [Citation.] That subtle, case-specific inquiry is what the statute asks courts to perform: does the benefit of placement in a new, adoptive home outweigh 'the harm [the child] would experience from the loss of [a] significant, positive, emotional relationship with [the parent?]' [Citation.]" (*Caden C., supra*, 11 Cal.5th at p. 633.)

Mother contends the juvenile court failed to properly weigh the harm to E.R. from severing the relationship with mother and the benefits she would gain from adoption. Mother points to the evidence that she has a significant, positive relationship with E.R. She also asserts that because the maternal grandparents are the prospective adoptive parents, "E.R.'s stability was not at risk, regardless of whether or not the court terminated parental rights." Mother thus argues that "from the perspective of E.R.'s best interests . . . there was not much, if any, upside to severing the parent-child relationship."

Yet, it would be inappropriate for the juvenile court to conclude that adoption would afford a child no significant benefit

8

because the prospective adoptive parents are likely to remain the child's caregivers, even if parental rights are not terminated. The legislative preference for adoption does not arise merely from the prospect of a permanent living situation. The preference also does not depend on the identification of a particular caregiver. (See, e.g., § 366.26, subd. (c)(1) [if court determines the child is likely to be adopted, court must terminate parental rights; "The fact that the child is not yet placed in a preadoptive home nor with a relative or foster family who is prepared to adopt the child does not constitute a basis for the court to conclude that it is not likely the child will be adopted."].) Instead, adoption is the Legislature's first choice because of the new and permanent legal and emotional relationships it creates. This is true even if the child is not adopted by the individuals who are the caregivers when parental rights are terminated.

The history of this case illustrates how adoption may provide the greatest stability and permanence to a child, even when the child is placed with relatives who might be willing to remain the caregivers under a permanent plan other than adoption. In December 2023, mother arrived at the maternal grandparents' home, drunk, and demanding to take E.R. When the maternal grandparents refused to let her take E.R., *mother* called law enforcement, ostensibly to enforce what she believed was her right to take her own child as she saw fit. An order terminating mother's parental rights would not necessarily prevent a similar occurrence in the future. But adoption would provide E.R. legal certainty and stability. E.R. would have new, adoptive parents, and mother would have no ability to insert herself into the legal relationship between E.R. and her adoptive parents. In contrast, legal guardianship would keep open the

9

possibility, however improbable, that mother may one day regain custodial rights.  Adoption forecloses that possibility.

As the California Supreme Court has explained: " 'Adoption is the Legislature's first choice because it gives the child the best chance at [a full] emotional commitment from a responsible caretaker.' [Citation.]  'Guardianship, while a more stable placement than foster care, is not irrevocable and thus falls short of the secure and permanent future the Legislature had in mind for the dependent child.' [Citation.]" (*In re Celine R.* (2003) 31 Cal.4th 45, 53.)

Further, the juvenile court was not merely tasked with determining whether E.R. and mother had a positive relationship.  The court was required to determine whether the relationship was "so important to [E.R.] that the security and stability of a new home wouldn't outweigh" the loss of that relationship. (*Caden C.*, *supra*, 11 Cal.5th at p. 633.)  Thus, a "parent must show more than frequent and loving contact or pleasant visits." (*In re C.F.* (2011) 193 Cal.App.4th 549, 555.)

Mother has not met this burden.  For example, the facts here are significantly different from those in *Caden C.*, where an expert opined that the child had such an "intense bond" with mother that it would "impede Caden in forming relationships with others," and the loss of contact with mother would lead to "emotional fluctuation, confusion, and acting out in the near term and in adolescence," as well as "difficulties in school, insomnia, anxiety, or depression." (*Caden C.*, *supra*, 11 Cal.5th at pp. 628, 633.)  Mother has not established that E.R.'s attachment to mother was so "significant" that their continued relationship would provide E.R. more than "some incidental benefit." (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 575.)

Mother failed to demonstrate that E.R. would suffer substantial detriment if the juvenile court terminated parental rights. The September 2024 permanency planning report indicated mother's visits were positive, and E.R. had a bond with mother, yet mother was not always attentive or affectionate. She chose to use her phone during visits and at times failed to hold E.R. or show affection when E.R. was looking to mother for comfort. Five months later, DCFS reported improvement, yet continued to report that E.R. was not significantly distressed when visits with mother ended. E.R. cried but was quickly comforted.

As we understand her arguments, mother contends the juvenile court failed to follow the *Caden C.* court's direction that when determining whether the termination of parental rights would be detrimental, the juvenile court does not compare the parent's "attributes as custodial caregiver relative to those of any potential adoptive parent(s)." (*Caden C.*, *supra*, 11 Cal.5th at p. 634.) The record does not establish that the juvenile court engaged in such improper weighing. The court could properly consider the benefits E.R. had already received from the stability provided by the current placement. In addition, the court was required to consider "how and how much" the harm to E.R. from losing a relationship with mother might be offset by a new family relationship. (*Id.* at p. 639.) The court was thus permitted to consider the "offsetting benefits of an adoptive home." (*Id.* at p. 638.)

Moreover, even if the juvenile court inappropriately considered mother's general instability, we do not reverse for harmless error. (*In re J.R.* (2022) 82 Cal.App.5th 526, 531.) Even when a parent alleges the juvenile court considered an

11

improper factor in assessing an element of the parental benefit exception test, we need not reverse if "the record in this case would not support a finding in mother's favor on the parental benefit exception." (*Ibid*.; see *id*. at pp. 532–533.)

On the record before us, we cannot find that " ' " 'under all the evidence, viewed most favorably in support of the trial court's action, no judge could reasonably have made the order that he [or she] did.' " ' " (*Caden C.*, *supra*, 11 Cal.5th at p. 641.) E.R. was very young at the time of the permanency planning hearing, " 'too young to understand the concept of a biological parent.' [Citation.]" (*In re Andrew M.* (2024) 102 Cal.App.5th 803, 816 (*Andrew M.*).) She had spent her entire life in the home of the maternal grandparents. Even when she was briefly placed with mother under DCFS supervision, she and mother continued living with the maternal grandparents. E.R. had a positive connection with mother, but experienced only minor distress when mother's visits ended. Mother identifies no specific harm E.R. would suffer from the termination of parental rights.

The reasoning of the court in *Andrew M.* is persuasive here. "There is no question that there are benefits in continued visits with loving parents to which the child has some substantial attachment. Yet to justify withholding the 'security,' 'stability,' and ' "sense of belonging a new family would confer" ' (*Caden C.*, *supra*, 11 Cal.5th at p. 633), the parents must prove more than ' "*some* benefit" ' [citation]. We do not suggest the parents must prove that any particular kind of harm would flow from the termination of parental rights. But they must prove some type of harm beyond the fact that their loving visits would cease. (See *Caden C.*, *supra*, 11 Cal.5th at p. 634 [providing examples of potential harms].) [¶] In appropriate cases, the strength of the

12

relationship alone can support a finding that its termination would have a 'destabilizing' effect on the child.  (*Caden C.*, *supra*, 11 Cal.5th at p. 634.)  But as discussed, the circumstances here do not support a conclusion that [mother's] relationship with [E.R.] was 'so important' as to outweigh the benefits of adoption. (*Id*. at pp. 633–634.)  In other words, this case cannot be deemed the kind of ' " 'extraordinary case' " ' in which preservation of parental rights prevails over the Legislature's preference for adoptive placement."  (*Andrew M.*, *supra*, 102 Cal.App.5th at p. 820.)

We find no error in the trial court's determination on the third element of the parental benefit exception.

**DISPOSITION**

The juvenile court order terminating parental rights is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


ADAMS, J.


We concur:



EDMON, P. J.




HANASONO, J.